**FALL CREEK CONSTRUCTION COMPANY, INC., Appellant,**

v.

**DIRECTOR OF REVENUE,**
Respondent.

No. SC 84917.

Supreme Court of Missouri,
En Banc.

July 1, 2003.

Bryan O. White, Kenneth N. Hall, Ginger K. Gooch, Springfield, Robert L. Hess, Jefferson City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., James R. Layton, State Solicitor, Nikki L. Loethen, Missouri Department of Revenue, Jefferson City, for respondent.

WILLIAM RAY PRICE, JR., Judge.

## I.

Fall Creek Construction Company seeks review of the decision of the Administrative Hearing Commission ("AHC") that Fall Creek is liable for $43,369.63 in use tax, plus accrued interest, on its fractional ownership interests in two aircraft enrolled in a fractional ownership program. The decision of the AHC is affirmed.

## II.

The underlying facts are not in dispute. Fall Creek is a real estate development company with its principal place of business in Branson, Missouri. Fall Creek develops real estate in Missouri, Mississippi, Arizona, Virginia and Tennessee. Fall Creek's employees regularly travel to and from locations where it develops real estate.

On October 30, 1998, Fall Creek acquired fractional interests in two aircraft from Raytheon Travel Air Company, a Kansas Corporation. Fall Creek purchased a 1/16 (6.25%) undivided interest in a King Air B200 aircraft, tail number N713TA for $254,000 and a 1/8 (12.5%) undivided interest in a Beech Jet 400A aircraft, tail number N798TA for $772,500.[1] Delivery of these interests occurred in Wichita, Kansas and neither Fall Creek nor Raytheon paid any sales or use tax to either Kansas or Missouri.

In order to purchase these interests, Fall Creek was required to enter into a series of four separate agreements for each aircraft—an aircraft purchase agreement, a joint ownership agreement, a man-agement agreement, and a master interchange agreement (these documents are collectively referred to as the "governing documents"). The purchase agreement indicates that Fall Creek "desires to purchase ... an undivided property interest in the aircraft" and also provides: (1) the buyer must execute the governing documents and must perform such actions as are required by the closing date; (2) no buyer may place a lien on the aircraft; (3) transfers to third parties are conditioned upon meeting strict requirements of Raytheon; (4) Raytheon has a right of first refusal on the transfer of interest; and (5) after 60 months, Raytheon must purchase the interest back from the buyer. Each owner also must execute an irrevocable power of attorney allowing Raytheon to file the appropriate application with the Federal Aviation Administration ("FAA") on each occasion that a fractional interest in the aircraft is purchased.

While the purchase agreement places restrictions on the fractional owners, the bill of sale recites that Raytheon "does ... hereby sell, grant, transfer and deliver all rights, title, and interests in and to an undivided ... interest in such aircraft unto: Fall Creek Construction Company, Inc." The FAA recognizes Fall Creek and the other co-owners as legal owners of a partial interest in each particular aircraft. Additionally, Fall Creek depreciates the aircraft on its accounting ledgers.[2]

The joint ownership agreement provides that co-owners place the aircraft into the master interchange program and agree that they are all tenants in common with respect to the aircraft. The co-owners

---

1. Fall Creek later, on September 22, 1999, traded its interest in the Beech Jet (798TA) back to Raytheon in exchange for a 1/8 (12.5%) undivided interest in another King Air B200, tail number N600TA. The value of Fall Creek's interest in the 798TA was in excess of the purchase price of its interest in the 600TA.

2. Tangible assets are typically depreciated and intangible assets are typically amortized for accounting purposes.

waive any right to partition and agree to divest themselves solely in accordance with the governing documents.

Under the management agreement, co-owners hire Raytheon to manage the aircraft. Owners pay a separate monthly management fee and a variable hourly rate for flight hours. Raytheon manages aircraft scheduling and must make reasonable efforts to obtain the owner's actual aircraft before providing a similar aircraft under the interchange program. Raytheon must also: (1) have the aircraft inspected, maintained, serviced, repaired, overhauled and tested; (2) maintain all required aircraft records and logs; (3) provide pilots, pilot training, pilot medical examinations and pilot uniforms; (4) provide hangaring and tie-down space, in-flight catering, flight planning, weather services, and communications; (5) maintain insurance on the aircraft; and (6) provide consulting regarding FAA issues, warranty claims, and insurance matters.

The master interchange agreement requires each owner to participate in the master interchange program by sharing its aircraft with other participants in the program. If an owner's aircraft is unavailable, Raytheon may substitute another similar aircraft from among the 110 aircraft in the program. Under the program, a participant informs Raytheon of the date and destination of the trip. Raytheon arranges for a program aircraft to carry the participant. Raytheon or the pilot determines whether the aircraft will fly to a location due to adverse weather conditions or other restrictions. However, the owner is in "operational control" of the aircraft while in the air and may direct the pilot to an alternate destination.

During the tax period, October 30, 1998, through December 31, 1999, aircraft 713TA made a total of 840 flights. Twenty-six flights were arrivals to or departures from Missouri. The aircraft remained overnight in Missouri thirteen times and Fall Creek used the aircraft in Missouri eight times.

Aircraft 798TA completed 897 flights during the tax period. Sixteen flights were arrivals to or departures from Missouri. The aircraft remained overnight in Missouri eleven times and Fall Creek used the aircraft in Missouri three times.

Fall Creek made a total of sixty-seven flights from or to Missouri during the tax period. These flights were made while traveling on a combination of its own aircraft and others from the interchange program. Fourteen of these sixty-seven flights were intrastate flights within Missouri.

The Director of Revenue conducted a sales and use tax audit of Fall Creek. After her audit, the Director assessed unpaid use tax in the amount of $60,453.42 and accrued interest totaling $8,120.67. The parties stipulated that, after allowing trade-in credit for aircraft 600TA, the total disputed amount is $49,928.79.[3]

### III.

■ "This Court has jurisdiction pursuant to Mo. Const. art. V, section 3 and reviews the AHC's interpretation of revenue law *de novo.*" *Shelter Mut. Ins. Co. v. Dir. of Revenue*, 107 S.W.3d 919, 920 (Mo. banc 2003) (citation omitted); *Southwestern Bell Yellow Pages, Inc. v. Dir. of Revenue*, 94 S.W.3d 388, 390 (Mo. banc 2002) (citation omitted). "This Court will uphold the AHC's decision if authorized by law and supported by competent and substantial evidence upon the whole record." Sec-

---

**3.** Use tax of $43,369.63 and accrued interest of $6,559.16.

tion 621.193;[4] *Shelter,* 107 S.W.3d at 920; *Southwestern Bell,* 94 S.W.3d at 390 (internal quotations omitted).

## IV.

■ Missouri's use tax, section 144.610, states:

1. A tax is imposed for the privilege of storing, using or consuming within this state any article of tangible personal property purchased on or after the effective date of sections 144.600 to 144.745 in an amount equivalent to the percentage imposed on the sales price in the sales tax law in section 144.020. This tax does not apply with respect to the storage, use or consumption of any article of tangible personal property purchased, produced or manufactured outside this state until the transportation of the article has finally come to rest within this state or until the article has become commingled with the general mass of property of this state.

This tax is a levy on the privilege of using within this state property purchased outside Missouri, where the property would have been subject to the sales tax if purchased locally. *Dir. of Revenue v. Superior Aircraft Leasing Co.,* 734 S.W.2d 504, 505 (Mo. banc 1987). Its purpose is to "complement, supplement, and protect the sales tax." *Id.* at 506 (quotation omitted). This tax "eliminates the incentive to purchase from out-of-state merchants in order to escape local sales taxes thereby keeping in-state merchants competitive with sellers in other states, and it also provides a means to augment state revenues." *Id.* (quotation omitted).

Fall Creek calls on this Court to determine whether its fractional ownership of two aircraft is taxable under Missouri's use tax and asserts four reasons why its interests are not taxable.

## 1.

■ Fall Creek first contends that it does not owe use tax because its fractional ownership interest in each aircraft does not constitute a purchase of tangible personal property, but merely represents the right to use any aircraft in the interchange program for a specified number of hours per year.

"Purchase" is defined as "the acquisition of the ownership of, or title to, tangible personal property, through a sale, as defined herein, for the purpose of storage, use or consumption in this state." Section 144.605(5). "Sale" is:

any transfer, barter or exchange of the title or ownership of tangible personal property, or the right to use, store or consume the same, for a consideration to be paid, and any transaction whether called leases, rentals, bailments, loans, conditional sales or otherwise, and notwithstanding that the title or possession of the property is retained for security.

Section 144.605(7). "Tangible personal property" is defined as "all items subject to Missouri sales tax as provided in subdivisions (1) and (3) of section 144.020." Section 144.605(11). The non-exclusive list of tangible personal property includes "motor vehicles, trailers, motorcycles, mopeds, motortricycles, boats and outboard motors...." Section 144.020(1). An aircraft is an item subject to Missouri sales tax. *See Westwood Country Club v. Dir. of Revenue,* 6 S.W.3d 885, 887 (Mo. banc 1999) (Where aircraft are sold to non-exempt entities a sales or use tax is to be collected on the sale of the final product.).

Fall Creek cites a New York advisory opinion and an "FYI" notice in *Tax Policy*

---

**4.** All statutory references are to RSMo 2000 unless otherwise stated.

*News* by the Texas Comptroller in support of its argument. While these sources do offer some support for Fall Creek's contention, they are not binding on this Court and, upon close review, appear to offer an incomplete analysis of fractional ownership taxation. The "FYI" is a half-page announcement applying to no specific case or controversy and with no citation to law, Carole Keeton Rylander, *FYI: Sales Tax,* TAX POLICY NEWS (Vol. X, Issue 8 Dec. 2000), while the New York advisory opinion concludes that there is never an actual sale at all in fractional aircraft ownership. *Gap, Inc.,* No. S990720A, 2000 N.Y. Tax LEXIS 37 (N.Y. Dept. of Taxation and Fin. Jan. 28, 2000). Neither source is persuasive in this case. Missouri law is well settled that, where no ambiguity exists in the contract language, "the court need not resort to construction of the contract, but rather the intent of the parties is determined from the four corners of the contract." *Eisenberg v. Redd,* 38 S.W.3d 409, 411 (Mo. banc 2001).

Here, the purchase agreement is unambiguous. It states that "Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the undivided property interest ... in the aircraft...." Were this Court to look beyond the four corners of the purchase agreement, other governing documents would also evidence Fall Creek's intention to purchase property interests in the aircraft. Raytheon executed a bill of sale indicating that it "does ... hereby sell, grant, transfer and deliver all rights, title, and interests in and to an undivided ... interest in such aircraft" to Fall Creek. Further, the separate master interchange agreement specifically states that it is "an arrangement whereby a person leases *his airplane* to another person in exchange for equal time, when needed, on the *other person's airplane*...." (emphasis added). The purchase agreement clearly and unambiguously demonstrates that Fall Creek intended and understood that it was purchasing an interest in tangible personal property—the aircraft.

■ Despite this unambiguous contract language, Fall Creek argues that an "essence of the transaction" test should determine the nature of the transaction. Fall Creek claims that its ownership of the physical aircraft is merely incidental and that the true nature of the transaction is one for transportation services. Clearly this was a complex transaction between sophisticated parties designed to maximize regulatory and tax advantages. However, the mere fact that the purchase agreement was executed along with other agreements does not render the contract ambiguous nor does it change the nature of Fall Creek's interest. Extrinsic evidence of contractual intent, including a determination of the "essence of the transaction," is necessary only if the contract contains an ambiguity. There is no ambiguity as to Fall Creek's purchase of fractional interests in the aircraft; therefore, an "essence of the transaction" analysis is not necessary.

Fall Creek unambiguously purchased an undivided fractional ownership interest in two aircraft as evidenced by the purchase agreement. The mere fact that it entered into additional management agreements with Raytheon does not change the nature of Fall Creek's ownership interest. Point one is denied.

## 2.

■ Next, Fall Creek argues that imposition of Missouri's use tax on its fractional ownership interest in the aircraft impermissibly burdens interstate commerce.

Historically, states could not tax interstate commerce and could only impose a sales or use tax during a "taxable moment"—that period of time "during which

the property [had] reached the end of its interstate movement and [had] not yet begun to be consumed in interstate operations." *Superior Aircraft,* 734 S.W.2d at 506. However, the United States Supreme Court later declared that interstate commerce is not immune from state and local taxation and "may constitutionally be made to pay its way." *Id.* (quoting *Maryland v. Louisiana,* 451 U.S. 725, 754, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)).

 While interstate commerce must "pay its way," a state's right to tax interstate commerce is limited. *Superior Aircraft,* 734 S.W.2d at 507. No state tax may be imposed unless the tax: "(1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State." *Id.* (citing *Maryland v. Louisiana,* 451 U.S. at 754, 101 S.Ct. 2114). Fall Creek challenges only the first element of this test—that there is a substantial nexus with Missouri.[5]

There exists the requisite nexus with Missouri, even though these aircraft were hangared and maintained primarily outside of this state. These aircraft departed from or arrived in Missouri forty-two times and remained overnight in Missouri twenty-four times during the tax period. "The use in Missouri, however brief, is a taxable incident" and was sufficient to create a substantial nexus. *R & M Enter., Inc. v. Dir. of Revenue,* 748 S.W.2d 171, 173 (Mo. banc 1988) (citing *Superior Aircraft,* 734 S.W.2d 504) (other citation omitted), *overruled on other grounds by House of Lloyd, Inc. v. Dir. of Revenue,* 884 S.W.2d 271 (Mo. banc 1994).[6] Point two is denied.

**3.**

 Fall Creek also claims that it had insufficient dominion and control over its aircraft to constitute "storage" or "use" under section 144.610. Fall Creek argues that Raytheon maintained control of the aircraft and that Fall Creek merely contacted Raytheon to request transportation to a particular location. Fall Creek cites to no other law supporting its contention.

"Storage" is defined as "any keeping or retention in this state of tangible personal property purchased from a vendor, except property for sale or property that is temporarily kept or retained in this state for

---

5. Fall Creek alleged only a lack of substantial nexus in its point relied on. As such, only this issue is preserved. Rule 84.04. However, in its argument, Fall Creek also complained that the second and fourth elements of the test could not be satisfied. Even if these issues were preserved, the result would not change. Missouri's use tax is fairly apportioned. "Multi-state tax burdens can constitutionally be avoided by either allowing an offset or credit for sales or use taxes paid in another state, or by a system of apportionment." *Superior Aircraft,* 734 S.W.2d at 507. Further, the use tax is fairly related to services provided by the state. Fall Creek used these aircraft for its business and "could have used Missouri state courts to enforce" the resulting business transactions, *id.,* and Fall Creek "enjoys the benefit and protection of our public services." *R & M Enter., Inc. v.*

*Dir. of Revenue,* 748 S.W.2d 171, 173 (Mo. banc 1988).

6. *House of Lloyd* considered application of the use tax to packing materials (foam peanuts, cardboard, tape, etc.) shipped with the primary merchandise to final purchasers. *Id.* at 272. *House of Lloyd* overruled *R & M Enterprises* "[a]s to packing material cases only" and only "to the extent it reads the phrase 'solely for resale' in the use tax law to vitiate the exemption if the taxpayer receives *any* benefit from holding the property prior to its shipment to the end purchaser." *Id.* at 274 (emphasis in original). Fall Creek raises no issue concerning the phrase "solely for resale" nor do the aircraft in question constitute packing material.

subsequent use outside the state." Section 144.605(10). "Use" is:

> the exercise of *any right or power* over tangible personal property incident to the ownership or control of that property, except that it does not include the temporary storage of property in this state for subsequent use outside the state, or the sale of property in the regular course of business[.]

Section 144.605(13) (emphasis added).

Fall Creek is simply incorrect in its assertion that "operational control" is *de minimus* control of the aircraft. One of the regulatory advantages of fractional ownership is the ability to operate within Part 91 of the Federal Aviation Regulations.[7] Philip E. Crowther, *Taxation of Fractional Programs: "Flying Over Uncharted Waters"*, 67 J. AIR L. & COM. 241, 249 (Spring 2002). "With certain exceptions, in order to operate under Part 91, the user must accept responsibility for 'operational control' of the aircraft." *Id.* Such responsibility is more than token. *Id.* The user-owner is held responsible by the FAA and civil courts if there is an incident. *Id.*

The Federal Aviation Regulations ensure that owners are fully aware of the consequences of having operational control. *Id.* An aircraft owner accepting "operational control" must acknowledge that he or she: "(i) has responsibility for compliance with all Federal Aviation Regulations applicable to the flight; (ii) may be exposed to enforcement actions for non-compliance; and (iii) may be exposed to significant liability risk in the event of a flight-related occurrence that causes personal injury or property damage." *Id.* (internal quotations omitted); 14 C.F.R. section 91.1013.

Operational control of an aircraft is a significant assumption of control and responsibility and is clearly sufficient to constitute "the exercise of any right or power." Section 144.605(13). Fall Creek used its aircraft when it boarded the aircraft and assumed operational control. Point three is denied.

### 4.

Last, Fall Creek maintains that the aircraft did not "finally come to rest" within Missouri as required by section 144.610. The use tax does not apply "until the transportation of the article *has finally come to rest* within the state or until the article has become commingled with the general mass of property of this state." Section 144.610(1) (emphasis added). Fall Creek insists that, because of the nature of the interchange program, the aircraft are purely transient and never come to rest in any location.

Fall Creek relies on *Nubo v. Director of Revenue*, No. RS–84–1778, 1987 Mo. Tax LEXIS 226 (Mo. Admin. Hearing Comm'n Dec. 30, 1987), in support of its argument. AHC decisions do not constitute precedent in this Court, *Ovid Bell Press, Inc. v. Dir. of Revenue*, 45 S.W.3d 880, 886 (Mo. banc 2001), and this Court is not bound by the AHC's interpretation of revenue law and exercises *de novo* review.[8] *Shelter Mut. Ins. Co. v. Dir. of Revenue*, 107 S.W.3d 919, 920 (Mo.

---

7. The governing documents indicate that the owners expect to operate under Part 91. The documents state that owners "will not use . . . Interchange Aircraft for the purpose of providing transportation of passengers or cargo in air commerce for compensation or hire except in accordance with the provisions of Section 91.501 [Part 91]. . . ."

8. Even if *Nubo* had any precedential value, it would not apply in this case, because the AHC indicated that the result might be different if, as here, there was evidence of intrastate flights or overnight hangaring in Missouri.

banc 2003) (citation omitted); *Southwestern Bell Yellow Pages, Inc. v. Dir. of Revenue*, 94 S.W.3d 388, 390 (Mo. banc 2002) (citation omitted).

This issue is controlled by *Director of Revenue v. Superior Aircraft Leasing Co.*, 734 S.W.2d 504 (Mo. banc 1987). There, a Missouri corporation purchased an aircraft in Kansas in order to lease it to an Ohio-based charter / aircraft retail company. *Id.* at 505. The aircraft was hangared and maintained in Ohio and was used infrequently in Missouri. *Id.* Although the language of section 144.610(1) was not expressly discussed in the majority opinion, this Court tacitly rejected the argument as evidenced by the dissenting opinion of Judge Welliver. *See id.* at 508–09 (Welliver, J., dissenting) ("Under these circumstances, I think that the airplane did not 'finally come to rest within this state'...."). Judge Welliver's dissent received no other votes and this Court applied the use tax despite the fact that Missouri was not the aircraft's permanent base or home. *Id.* at 508.

This Court also addressed the language of section 144.610(1) in *R & M Enterprises, Inc. v. Director of Revenue*, 748 S.W.2d 171 (Mo. banc 1983), *overruled on other grounds by House of Lloyd, Inc. v. Dir. of Revenue*, 884 S.W.2d 271 (Mo. banc 1994).[9] *R & M Enterprises* applied the use tax to books that were bound outside of Missouri but stored briefly in the state before being shipped to retailers both inside and outside of Missouri. *Id.* at 171. This Court said:

> ... [A]ppellant ... has complete dominion and control over [the books]. They come to rest in Missouri.... [Appellant] has the privilege of "using," in the sense of the statute. It makes no difference

that it may assert this privilege only a very brief time. The privilege of using is the occasion for taxation.

*Id.* at 172. The aircraft here are no different than the books in *R & M Enterprises*. Once the aircraft were delivered to Missouri, Fall Creek obtained operational control and had the privilege of using the aircraft in Missouri. That privilege triggered imposition of the use tax and brought the aircraft within the statute, such that the aircraft finally came to rest in Missouri and became commingled with the general mass of property of the state. "It makes no difference that [Fall Creek asserted] this privilege only a very brief time." *Id.*

The phrase "finally comes to rest" must necessarily be considered in relation to the object to which it applies. Were this Court to adopt Fall Creek's strict construction of the statute, no aircraft, motor vehicle or other transitory object could ever finally come to rest in Missouri until it "finally" entered the junkyard or scrap heap, for until then such objects always have the capability of leaving the state. The term "finally" cannot have such an exclusive meaning in this context. Rather, "finally" merely indicates that the property is "finally" in Missouri ready for use. In this context, the term "finally" need not mean that the property must remain here forever or be "domiciled" here, especially transitory property like airplanes whose use may require that they fly in and out of the state. Just as "[v]egetables do not have to 'come to rot' in order to [finally] 'come to rest,' "[10] aircraft need not be interred in an airplane graveyard to satisfy the statute.

---

9. *See* note 6 for discussion of the implication of *House of Lloyd* on *R & M Enterprises*.

10. *James v. Reuter, Inc. v. Walling*, 137 F.2d 315, 319 (5th Cir.1943), *judgment vacated as moot by Walling v. James v. Reuter, Inc.*, 321 U.S. 671, 64 S.Ct. 826, 88 L.Ed. 1001 (1944).

Here, the aircraft finally came to rest in Missouri when they landed in this state and Fall Creek exercised control over them and used them in this state. Point four is denied.

## V.

For the foregoing reasons, the decision of the Administrative Hearing Commission is affirmed.

All concur.