SUPREME COURT OF MISSOURI
 en banc
APLUX, LLC, AND PAUL & ) Opinion issued March 2, 2021
ANN LUX ASSOCIATES, L.P., )
 )
 Respondents, )
 )
v. ) No. SC98409
 )
DIRECTOR OF REVENUE, )
 )
 Appellant. )

 PETITION FOR REVIEW OF A DECISION OF THE
 ADMINISTRATIVE HEARING COMMISSION
 The Honorable Sreenivasa Rao Dandamudi, Commissioner

 The director of revenue seeks review of the decision of the administrative hearing

commission (AHC) finding no use tax liability for APLUX LLC and Paul and Ann Lux

Associates L.P. on the out-of-state purchase of two aircraft, referred to as “the TBM” and

“the Excel.” After purchase, both aircraft were brought to Missouri. APLUX asserts it

leased each aircraft on a non-exclusive basis—the TBM to its parent company, Luxco Inc.,

and the Excel concurrently to both Luxco and Aero Charter Inc., a common carrier. The

issue before this Court is whether the AHC erred in holding each lease agreement

constituted a “sale” for purposes of the use tax resale exemption set out in section 144.018
and related statutes. 1 If each agreement was a “sale,” the AHC correctly held APLUX was

entitled to elect to pay sales tax on the lease payments it received from Luxco. 2 The

director, however, argues APLUX could not elect to pay tax on the lease payments and,

instead, owed the substantially greater use tax on the purchase price of each aircraft because

its transaction with neither Luxco nor Aero constituted a lease for purposes of the use tax

law. 3

 With respect to the APLUX-Luxco agreement for both the TBM and the Excel, this

Court agrees with the director that APLUX’s agreement with Luxco did not transfer use of

either aircraft because APLUX retained general control and priority use of both aircraft

and Luxco, which had no priority to use either aircraft, could operate the aircraft only if

APLUX had not already leased them to a third party or claimed priority use for itself. This

is not a transfer of use, which requires both the exercise of “any right or power” over

property and either “ownership or control” of that property. § 144.605(13). For that

reason, a “sale” to Luxco did not occur, and APLUX is not entitled to a resale exemption

on the purchase of either aircraft based on the Luxco agreement. This Court reverses the

AHC’s contrary conclusion and remands the case for a determination of the tax due.

1
 All statutory citations are to RSMo Supp. 2010 unless otherwise noted.
2
 The director did not assess tax against the lease payments from Aero as it is a common
carrier and the lease payments are exempt from sales tax under section 144.030.2(20).
3
 As discussed below, the AHC relied on 12 C.S.R. § 10-108.700(3), which provides, in
relevant part, “[w]hen a lessor purchases tangible personal property for the purpose of
leasing, the lessor may pay tax on the purchase price or claim a resale exemption based on
the intended lease of the tangible personal property” and, further, “[i]f the lessor claims a
resale exemption on its purchase, the amount charged for lease of the tangible personal
property is subject to tax.”
 2
 The AHC correctly held the APLUX-Aero agreement for the Excel did qualify for

the use tax exemption relied on by APLUX. Under that agreement, APLUX was required

to deliver the Excel to Aero’s base of operation at the Spirit of St. Louis Airport, where it

was required to be hangered in Aero’s custody throughout Aero’s lease. Aero could and

did conduct charter flights at any time, without APLUX’s permission, and APLUX could

not override Aero’s schedule (with the sole exception that Aero could not refuse to honor

a flight already scheduled by APLUX). Further, Aero had operational control of the Excel

during charter flights and was solely responsible for its maintenance. These factors are

comparable to those in Business Aviation, LLC v. Director of Revenue, 579 S.W.3d 212,

217 (Mo. banc 2019), which this Court found sufficient to constitute a “sale” under the tax

law. They are also sufficient here. For that reason, the AHC did not err in concluding

APLUX was entitled to a resale exemption on its purchase of the Excel for resale to Aero

under sections 144.018.1(4), 144.615(3), and 144.030.2(20).

 The AHC’s decision is affirmed in part and reversed in part, and the case is

remanded.

 I. FACTUAL AND PROCEDURAL BACKGROUND

 APLUX is a manager-managed Missouri limited liability company created by Donn

Lux and Stephen Soucy. 4 It has no employees, and its sole business purpose is to own and

lease aircraft. It is a wholly owned subsidiary of Luxco, a Missouri S-corporation that

4
 Paul and Ann Lux Associates L.P. was a Missouri limited partnership and was the sole
member of APLUX prior to its voluntary dissolution in 2011. Paul and Ann Lux, the
partners of Paul and Ann Lux Associates L.P., are Donn Lux’s parents. Paul Lux died in
2005.
 3
makes and markets alcoholic beverages. 5 Donn Lux is both a managing member of

APLUX and the chief executive officer and chairman of Luxco.

 A. Purchase and Agreement as to the TBM

 In August 2011, APLUX purchased a 2011 Socata TBM 850 aircraft (“the TBM”)

from a Texas company for $3.22 million. 6 It provided the Texas seller with a sales tax

exemption certificate stating the TBM would not be used in Texas and would be hangered

in Missouri. Ten days after purchase, APLUX and Luxco executed what they claimed was

a “non-exclusive dry lease agreement” 7 for the TBM. Under the agreement, Luxco agreed

to pay APLUX $114,000 annually in exchange for the ability to use the TBM on a

non-exclusive basis. But, as discussed in detail below in analyzing whether this agreement

was a “sale” under the use tax statutes, the agreement did not cede control of the TBM to

Luxco. To the contrary, it provided that APLUX had priority of use of the TBM and could,

at its sole discretion, “lease” the TBM to others during the term of Luxco’s agreement. The

agreement also stated the lease was non-exclusive, gave APLUX at all times the “absolute

5
 Luxco is the only current member of APLUX.
6
 When APLUX purchased the TBM, Paul and Ann Lux Associates L.P. was its sole
member.
7
 In aviation law, a “dry lease” is “a lease for an aircraft under which the aircraft’s owner
surrenders possession and control of the aircraft—without providing a crew—to the lessee,
who then succeeds to many of the aircraft owner’s rights and obligations.” DRY LEASE,
Black’s Law Dictionary (11th ed. 2019). Whether APLUX actually surrendered control of
the aircraft, and whether its agreement actually constituted a lease or was, instead,
something less, despite the agreement’s title, is discussed below.
 4
right” to determine whether to make the TBM available to Luxco, and provided Luxco

operational control of the plane only while the TBM actually was in its possession. 8

 After executing the “lease” agreement with Luxco, APLUX also signed a

management agreement with Aero for the TBM. Aero is a private charter company and

common carrier based out of the Spirit of St. Louis Airport in Chesterfield, Missouri. In

addition to charter services under part 135 of the Federal Aviation Administration (“FAA”)

regulations, 9 Aero provides aircraft management and maintenance services. 10 Under the

management agreement, APLUX paid Aero to provide insurance, maintenance, and hangar

space for the TBM. Luxco did not enter into its own management agreement with Aero

for the TBM until nearly a year after APLUX executed the TBM agreement with Luxco.

 B. Purchase and Agreement as to the Excel

 In January 2012, APLUX purchased a 1999 Cessna 560XL (“Excel”) in Kansas for

$3.15 million. APLUX provided the Kansas seller with a sales tax exemption certificate.

The next month, APLUX executed the same type of agreement with Luxco for the Excel

as it had for the TBM, except, in the case of the Excel, the parties agreed on a $117,600

8
 The parties agreed that “operational control” as used in the agreement had the same
definition as in the FAA’s regulations, which state operational control “means the exercise
of authority over initiating, conducting or terminating a flight.” 14 C.F.R. § 1.1.
9
 The FAA regulates all passenger flights. There are three major sets of operating rules
under title 14 of the Code of Federal Regulations: part 91 (General Operations), which
applies to all flights; part 121 (Air Carriers and Operators for Hire), which applies to
common carriers such as domestic airline corporations; and part 135 (Commuter and On
Demand Operations), which applies to common carrier operations for chartered or
on-demand flights.
10
 The parties agree that Aero is a common carrier. See Balloons Over the Rainbow, Inc.
v. Dir. of Revenue, 427 S.W.3d 815, 826 (Mo. banc 2014) (setting forth the necessary
requirements for common carrier status).
 5
annual payment. As in the case of the TBM agreement, the Excel agreement provided that

APLUX retained for itself: 1) the unfettered right to “lease” the Excel to others during

Luxco’s term; 2) priority use of the Excel; and 3) the absolute authority to determine the

Excel’s availability for Luxco. 11 Luxco was granted operational control of the Excel only

if and when it operated it.

 APLUX also executed what it again styled a “dry lease agreement” with Aero for

the same Excel and, at a later point, a management agreement. At this point, Aero was not

just a manager as to the Excel but also was a second lessee of the Excel along with Luxco.

The agreement between Aero and APLUX for the Excel did not mirror APLUX’s

agreement with Luxco for either the Excel or the TBM. Instead, it allowed Aero to use the

Excel for charter flights in exchange for a monthly rental fee that would be calculated

according to the number of hours Aero chartered the plane. The agreement also required

Aero to maintain its “operating certificate” and comply with all FAA regulations and

United States Department of Transportation registration requirements; gave Aero

operational control of the Excel while operating it for charter flights; and required APLUX

to deliver the Excel to Aero. Only at the expiration of the agreement’s term would Aero

return the plane to APLUX. In addition, the agreement required the Excel to be hangered

11
 Although APLUX had the priority right to fly the TBM and Excel, the parties agree it
never operated either aircraft during the relevant lease terms. Donn Lux was a licensed
pilot qualified to fly the TBM and periodically flew the plane as pilot in command. He
was not an employee of Aero. Other than part 91 flights by Aero, which are non-charter
flights used for repositioning, maintenance, or owner flights, the TBM was used only by
Luxco, its personnel, and friends or family of its personnel. As for the Excel, Aero
conducted charter flights as authorized by the agreement with APLUX, and Luxco used
the Excel for “owner flights” under part 91 when it was not already chartered.
 6
with Aero for the duration of the term and remain in Aero’s legal and actual possession

even when not in use. It also required Aero to provide maintenance and insurance for the

Excel at APLUX’s expense.

 C. APLUX Did Not Pay Use Tax on the Purchase Price of the TBM or Excel

 APLUX did not pay use tax on the purchase of either the TBM or the Excel. Instead,

it remitted sales tax on the “lease” payments it received from Luxco for both aircraft,

believing that its “lease” agreement with Luxco constituted a “sale” and qualified for the

resale tax exemption such that it could pay sales tax on the “lease” payments instead of use

tax on the purchase price as permitted under 12 C.S.R. § 10-108.700(3):

 (A) When a lessor purchases tangible personal property for the
 purpose of leasing, the lessor may pay tax on the purchase price or claim a
 resale exemption based on the intended lease of the tangible personal
 property.
 1. If the lessor pays tax on the purchase price, the subsequent
 lease of the tangible personal property is not subject to tax.
 2. If the lessor claims a resale exemption on its purchase, the
 amount charged for lease of the tangible personal property is subject
 to tax.
 3. The election to pay tax on the purchase price must be made
 at the time the tangible personal property is purchased by the lessor.
 If tax is not paid on the tangible personal property at the time of the
 purchase, the lease is subject to tax.
 4. If the lessor acquires the property in some way other than a
 taxable purchase (e.g., through a repossession or foreclosure, or by
 self-manufacturing), the amount charged for lease of the tangible
 personal property is subject to tax.

 7
 APLUX did not pay sales tax on APLUX’s lease of the Excel to Aero because Aero

is a common carrier and section 144.030.2(20) contains an express exemption for tax on

sales, including leases, to common carriers. 12

 In 2014, the director conducted sales and use tax audits of APLUX and issued his

assessment finding APLUX owed use tax on the purchase price of both aircraft and could

not elect instead to pay sales tax on the alleged lease payments from Luxco. 13 APLUX

filed a petition with the AHC challenging the director’s assessment.

 The AHC rejected the director’s assessment. It relied heavily on Business Aviation,

LLC v. Director of Revenue, 579 S.W.3d 212, 217 (Mo. banc 2019), in concluding

APLUX’s purchase of both aircraft qualified for a resale tax exemption because APLUX

had transferred the use of the two airplanes by lease to Luxco and did not use them during

the relevant time periods (although recognizing APLUX had retained the right to do so).

The AHC also agreed APLUX was entitled to the resale exemption for the Excel under

sections 144.018.1(4), 144.615(3), and 144.030.2(20) because Aero was a common carrier.

The director sought this Court’s review.

 This Court has exclusive appellate jurisdiction because this case involves the

construction of Missouri’s revenue laws. Mo. Const. art. V, § 3. “A ‘revenue law’ is one

12
 Section 144.030.2(20) exempts from sales tax (and use tax) “[a]ll sales of aircraft to
common carriers for storage or for use in interstate commerce.” § 144.030.2(20).
13
 The director determined APLUX owed a total of $96,322.34 for the period of July 1,
2011, through September 30, 2011, and $112,802.02 for the period of January 1, 2012,
through March 30, 2012. Both figures included unpaid use tax, additions to tax, and
interest. The first figure also included a credit for the $59,665.68 in sales tax that APLUX
already had remitted.
 8
that imposes, amends, or abolishes a tax or fee.” Armstrong-Trotwood, LLC v. State Tax

Comm'n, 516 S.W.3d 830, 834 (Mo. banc 2017).

 II. STANDARD OF REVIEW AND BURDEN OF PROOF

 This Court will affirm a decision of the AHC if it: (1) is authorized by law;
 (2) is supported by competent and substantial evidence on the whole record;
 (3) does not violate mandatory procedural safeguards; and (4) is not clearly
 contrary to the General Assembly’s reasonable expectations. This Court does
 not uphold a decision of the AHC if it is arbitrary, capricious, unreasonable,
 unlawful, or in excess of jurisdiction.

Kan. City Chiefs Football Club, Inc. v. Dir. of Revenue, 602 S.W.3d 812, 817 (Mo. banc

2020) (citations, quotations, and alterations omitted); see also § 621.193, RSMo 2000.

“This Court reviews the AHC’s legal decisions de novo. This Court is not bound by the

[AHC]’s interpretation and application of the law.” Kan. City Chiefs, 602 S.W.3d at 818.

 Tax exemptions and exclusions “must be strictly construed against the taxpayer, and

any doubt must be resolved in favor of application of the tax.” Bartlett Int’l, Inc. v. Dir. of

Revenue, 487 S.W.3d 470, 472 (Mo. banc 2016). “An exemption is allowed only upon

clear and unequivocal proof, and any doubts are resolved against the party claiming it.” Id.

“The burden is on the taxpayer seeking the exemption to show that the transaction at issue

fits the statutory language exactly.” Id.

III. APPLICABLE PRINCIPLES OF TAX LAW

 “Out-of-state purchases are subject to a use tax for the privilege of storing, using or

consuming within the state tangible personal property.” DI Supply I, LLC v. Dir. of

Revenue, 601 S.W.3d 195, 197 (Mo. banc 2020), citing, § 144.610, RSMo 2000. All parties

agree an aircraft purchased out of state is tangible personal property subject to use tax

 9
unless the taxpayer meets its burden of demonstrating an exemption applies. Bus. Aviation,

579 S.W.3d at 217.

 At issue in this case is the application of section 144.018.1, which provides:

 1. Notwithstanding any other provision of law to the contrary, except as
 provided under subsection 2 or 3 of this section, when a purchase of
 tangible personal property or service subject to tax is made for the
 purpose of resale, such purchase shall be either exempt or excluded under
 this chapter if the subsequent sale is:

 (1) Subject to a tax in this or any other state;
 (2) For resale;
 (3) Excluded from tax under this chapter;
 (4) Subject to tax but exempt under this chapter; or
 (5) Exempt from the sales tax laws of another state, if the subsequent
 sale is in such other state.

 Under this statute, a purchase for resale is exempt from tax under chapter 144 (i.e.,

both sales and use tax) if the subsequent “sale” fits one of the five enumerated

circumstances. 14 “Sale” has a different (but overlapping) definition depending on whether

14
 Although the director argues a taxpayer must first qualify for a separate resale exemption
before the provisions of section 144.018.1 come into play, that is not always the case. The
plain language of section 144.018.1 provides, “Notwithstanding any other provision of law
to the contrary,” tangible personal property purchased for resale is exempt from tax “under
this chapter”—meaning chapter 144, which governs both sales and use tax—if the resale
falls into one of the five enumerated categories in the statute. § 144.018.1. Not all of these
categories appear to require taxpayers to prove they fit under another exemption. For
example, section 144.018.1(1) simply requires a taxpayer to demonstrate the subsequent
sale is subject to tax. Nothing in this wording appears to require as a condition of its
application that the taxpayer show the sale is subject to a separate statutory exemption.
APLUX claimed a resale tax exemption under section 144.018.1 and, while it separately
claims an exemption under section 144.615(6), discussed in note 18 below, whether that is
the case does not affect the applicability of section 144.018.1. This Court has expressly
held that, when the legislature provided for two different statutory procedures to seek relief
from overpayment, neither of which was designated as the exclusive avenue for relief, there
is “no reason to interpret either provision as the sole avenue available to the taxpayer here.”
Dir. of Revenue v. Westinghouse Credit Corp., 787 S.W.2d 715, 717 (Mo. banc 1990).
 10
the sales or use tax laws are implicated, and a “sale” must occur under both the sales and

use tax law when a claimed use tax exemption cross-references a sales tax statute. Bus.

Aviation, 579 S.W.3d at 217.

 APLUX claims a pure use tax resale exemption under section 144.018.1(1) for its

purchase of the TBM and Excel based on its subsequent agreement with Luxco for use of

both aircraft. The use tax law defines “sale” as “any transfer, barter or exchange of the title

or ownership of tangible personal property, or the right to use, store or consume the same,

for a consideration paid or to be paid.” § 144.605(7) (emphasis added). Importantly, the

use tax law defines “use” as “the exercise of any right or power over tangible personal

property incident to the ownership or control of that property.” § 144.605(13) (emphasis

added). So, under the use tax law, a “sale” can include “any transaction whether called

leases, rentals, bailments, loans, conditional sales or otherwise, and notwithstanding that

the title or possession of the property or both is retained for security.” § 144.605(7).

 As for its agreement with Aero for the Excel, APLUX claims a use tax resale

exemption for the purchase of the Excel under the interplay between the use and sales tax

exemptions in sections 144.018.1(4) (a resale exemption applicable to both sales and use

tax), 144.615(3) (a list of use tax exemptions), and 144.030.2(20) (a list of sales and use

tax exemptions in the sales tax portion of Chapter 144). 15 APLUX, therefore, must show

15
 Section 144.018.1(4) provides that a purchase for resale is exempt from tax under chapter
144 (which governs both sales and use tax) if the subsequent sale is “[s]ubject to tax but
exempt under this chapter.” The lease of the Excel to Aero—i.e., the “subsequent sale”—
is subject to sales tax under section 144.020.1(8) and, likewise, would be subject to use tax
under section 144.610.1. APLUX claims the lease to Aero is, nonetheless, exempt from
sales and use tax under sections 144.615(3) and 144.030.2(20). Section 144.615(3)
 11
the Aero agreement satisfies the definition of “sale” under both the sales and use tax laws,

requiring it to demonstrate “the right to use the aircraft was transferred to [the transferee]

for valuable consideration paid or to be paid.” Bus. Aviation, 579 S.W.3d at 217. As with

use tax, a “sale” under the sales tax law can include a lease. Id. There is no question that

APLUX paid valuable consideration, but there is a question whether a “sale,” as defined in

the relevant tax law, occurred at all. 16

IV. THE APLUX-LUXCO AGREEMENT DOES NOT QUALIFY FOR THE USE
 TAX EXEMPTION CLAIMED BY APLUX FOR THE TBM AND EXCEL

 APLUX suggests Business Aviation governs this Court’s analysis of whether it

transferred use of the aircraft—i.e., whether a “sale” occurred. As in this case, Business

Aviation turned on whether a taxpayer had “used” tangible personal property under the tax

law.

exempts from use tax any property, the sale or other transfer of which would be exempt
from sales tax under section 144.030.2, and section 144.030.2(20) exempts “[a]ll sales of
aircraft to common carriers for storage or for use in interstate commerce.” § 144.030.2(20).
16
 This Court rejects without further analysis APLUX’s alternative argument that its
agreement with Luxco qualifies its purchase of one or both aircraft for the resale exemption
in section 144.615(6). That section exempts from use tax “[t]angible personal property
held by processors, retailers, importers, manufacturers, wholesalers, or jobbers solely for
resale in the regular course of business.” APLUX claims it is an importer because it
“imports” aircraft from other states into Missouri, but it cites no authority stating an
interstate sale constitutes an “import” even though numerous provisions address interstate
sales. APLUX bears the burden of proving it fits within an exemption. Bartlett Int’l, 487
S.W.3d at 472. In the absence of authority that the legislature intended to give a special
meaning to “importers” in section 144.615(6), and in light of the fact that the tax statutes
often refer to purchase of property out of state but never refer to such a purchase as
importation, this Court rejects the argument. See WEBSTER’S THIRD NEW
INTERNATIONAL DICTIONARY 1135 (3rd ed. 1993) (defining an “importer” as “one that
imports; esp: one whose business is the importation and sale of goods from a foreign
country” (emphasis added)).
 12
 Business Aviation purchased an aircraft and then leased it to a common carrier for

part 135 charter flights. 579 S.W.3d 214. Business Aviation challenged the assessment of

use tax against it on the purchase, claiming it qualified for a resale tax exemption under the

interplay among sections 144.018.1(4), 144.615(3), and 144.030.2(20). 17 Id. To resolve

whether the claimed exemption applied, this Court had to determine whether the lease

constituted a “sale” under the sales and use tax statutes—which in turn required it to

determine whether there was a transfer of “use” for valuable consideration.

 The Court noted “use” is defined under the use tax law as “[t]he exercise of any

right or power over tangible personal property incident to the ownership or control of that

property.” Id. at 217, quoting, § 144.605(13), RSMo 2000 (second emphasis added). 18

“Use,” therefore, has two components. It requires not just an exercise of a right or power

over tangible personal property but also an exercise of a right or power dependent on or

arising out of the ownership or control of that property. See id. at 217-18.

 The Court detailed the control over the aircraft the lessee, Burgess, was given by

the agreement, and focused on whether the agreement thereby transferred to Burgess the

17
 These are the same statutes under which APLUX claims an exemption for its agreement
with the common carrier Aero for the Excel. Whether the purchase of the Excel is exempt
is addressed below.
18
 The adjective “incident” in this context means “something dependent upon, appertaining
or subordinate to, or accompanying something else of greater or principal importance” or
“something arising or resulting from something else of greater or principal importance.”
WEBSTER’S THIRD NEW INTERNATIONAL DICTIONARY 1142 (3rd ed. 1993). Black’s
Law Dictionary defines “incident” in this context as, “Dependent on, subordinate to, arising
out of, or otherwise connected with.” INCIDENT, Black’s Law Dictionary (11th ed. 2019).
 13
right to exercise “any right or power” over the aircraft incident to that control. Id. at 217-

18. This Court found the agreement did, stating:

 [T]he right to use was transferred because “Business Aviation transferred
 complete operational and maintenance control of the [aircraft] to Burgess.”
 Pursuant to the lease agreement, Burgess was granted “the exclusive care,
 custody and control of the Aircraft during the term of [the Lease] and at all
 times during any Part 135 charter operations conducted by [Burgess].” In
 fact, each time the aircraft was flown, Burgess maintained exclusive custody
 and control. When the aircraft was not being flown it was stored at Burgess’
 hangar facility. Accordingly, Business Aviation transferred the exercise of
 right and power over the aircraft.

Id. at 218 (emphasis added) (footnote omitted). This Court also held it did not matter that

some small aspects of control remained with Business Aviation, for the definition of “use”

did not require that control be “fully” transferred. Id. at 218 n.9. Transfer of “use” requires,

as quoted above, only transfer of “the exercise of any right or power over tangible personal

property incident to the ownership or control of that property.” § 144.605(13) (emphasis

added). Control was transferred, as demonstrated by the passage quoted above.

 APLUX argues Business Aviation governs the Luxco agreements at issue here

involving both the TBM and Excel and that, if “full” control need not be transferred then,

basically, transfer of any amount of control will allow the taxpayer to avoid paying use tax

on the purchase price of tangible personal property. This overreads Business Aviation,

which must be read in light of its facts. In Business Aviation, the lessee had been

transferred custody and control of the aircraft. 579 S.W.3d at 218. While the opinion does

not list all aspects of that custody and control, as noted above, it involved “complete

operational and maintenance control,” as well as the “exclusive care, custody and control

 14
of the Aircraft during the term of [the Lease] and at all times during any Part 135 charter

operations conducted by [Burgess].” Id. (alterations in original).

 The facts here are entirely different. APLUX transferred to Luxco mere operational

control during a flight. 19 Even were that sufficient to satisfy the “exercise of right and

power” over the plane under Business Aviation, the governing provisions of the APLUX-

Luxco agreement plainly left control of both the TBM and the Excel with APLUX except

when actually being flown by Luxco:

 2.1 Lease. … Lessee acknowledges that except during the period
 that Lessee has possession of the Aircraft, Lessee will have no right to use,
 possess, or otherwise have access to the Aircraft. Lessee further
 acknowledges that Lessee does not, and will not at any time, have a priority
 or preference to use, possess or lease the Aircraft over any other person.
 ….
 3.3 Scheduling. Lessee’s use of the Aircraft during the Term of this
 Agreement is non-exclusive. The parties agree as follows:
 (a) Use by Other Lessees. Lessor and Lessee agree that Lessor may
 lease the Aircraft to one or more other lessees during the Term on a non-
 exclusive basis, that Lessor has the absolute right to determine the
 availability of the Aircraft for Lessee and the Lessor’s use of the Aircraft
 shall have priority over the availability of the Aircraft for lease to Lessee or
 any other party. …
 ….
 5.1 Title and Registration. Title to the Aircraft shall remain vested
 in Lessor at all times during the Term to the exclusion of Lessee ….
 5.2 Use and Operation. Except as otherwise expressly provided
 herein, Lessee shall be solely and exclusively responsible for the use, and
 operation and control of the Aircraft during each period of the Term
 commencing when the Aircraft has been delivered to Lessee and terminating
 when the Aircraft has been returned to the Lessor in the condition required
 hereunder.

 “5.6 Operational Control. THE PARTIES EXPRESSLY AGREE THAT LESSEE
19

SHALL AT ALL TIMES WHILE THE AIRCRAFT IS IN ITS POSSESSION DURING
THE TERM MAINTAIN OPERATIONAL CONTROL OF THE AIRCRAFT[.]”
 15
(Italics added); see also APLUX-Luxco Agreement § 2.2 (non-exclusivity).

 Unlike the lessee in Business Aviation, Luxco never had exclusive care and custody

of the aircraft. APLUX retained priority and control except when the aircraft was in the

air on a Luxco flight, and Aero—not Luxco—was the company providing hangar space,

maintenance, and other management services for the aircraft. When not being flown by

Luxco, the agreement provided Luxco had “no right to use, possess, or otherwise have

access to the Aircraft,” and APLUX reserved for itself the “absolute right” to decide

whether and when the aircraft would be available for Luxco and to lease the aircraft

non-exclusively to as many third parties as it wished. 20 In short, while the Business

Aviation record showed Business Aviation’s agreement gave Burgess control, 579 S.W.3d

at 214-15, that is not the case with APLUX’S agreement with Luxco. 21 The fact that

Business Aviation recognized a lessor may retain some small measure of authority without

invalidating the lease for tax purposes is not a holding that a transfer of control occurs

whenever any control is transferred. Indeed, a “sale” under the tax law can exist when one

retains for security purposes the “title or possession of the property,” but it does not provide

that one additionally can retain general and prioritized control. § 144.605(7). A broader

20
 While the lease required APLUX to use “good faith” efforts to avoid scheduling
conflicts, it also provided APLUX had no liability whatsoever for the unavailability of the
aircraft, regardless of the reason for the unavailability.
21
 APLUX argues it transferred use under the Luxco agreement because Luxco entered into
agreements styled as “timeshare” agreements for both the TBM and Excel. Nothing in the
relevant agreement between APLUX and Luxco, however, purported to allow Luxco to
execute such an agreement with third parties such as Ann Lux. That APLUX—a company
controlled by the same individual who controls Luxco—ultimately chose not to challenge
the Luxco “timeshare” agreements does not establish that Luxco actually had the legal right
to execute them.
 16
reading of “control” would invite abuse, as a purchaser could give a third party the right to

use an aircraft or other personal property for a short period and for a minimal payment but

otherwise retain control and thereby avoid both the sales tax and any substantial use tax.

Business Aviation does not so permit.

 APLUX did not transfer to Luxco use of either the TBM or Excel; therefore, its

agreement with Luxco was not a “sale” under the use tax law. The AHC erred in finding

otherwise. 22

 V. THE RIGHT TO USE THE EXCEL WAS TRANSFERRED TO AERO

 Also at issue is the application of Business Aviation to the Aero agreement for the

Excel. This involves a different analysis given the significantly different provisions in the

Aero agreement. APLUX argues that, even were Business Aviation alone not dispositive,

its agreement with Aero qualifies for the resale tax exemption because it “transferred use”

under Fall Creek Construction Co. v. Director of Revenue, 109 S.W.3d 165, 169 (Mo. banc

2003).

 In Fall Creek, a taxpayer purchased a fractional ownership in an aircraft and

challenged the assessment of use tax against its purchase. Id. at 167. Relevant here, the

taxpayer argued that, while it qualified as an owner, “it had insufficient dominion and

control over its aircraft to constitute ‘storage’ or ‘use’ under section 144.610.” Id. at 171.

This Court rejected that argument because, as a fractional owner of the aircraft, Fall Creek

22
 The AHC seized on the fact that APLUX had not operated the aircraft to determine
APLUX had transferred use to Luxco. But such actual use by Luxco is irrelevant when the
language of the agreement is clear that APLUX retained control and the priority right to
use both aircraft.
 17
had “operational control” over it under part 91 of the FAA. Id. at 172. This Court

concluded that operational control was sufficient to constitute “the exercise of any right or

power” incident to Fall Creek’s ownership; therefore, Fall Creek “used” the aircraft under

section 144.610. Id.

 APLUX argues that, because Aero had operational control of the Excel during part

135 charter flights, just as the taxpayer in Fall Creek had operational control of the aircraft

under part 91 flights, Aero “used” the aircraft just like the taxpayer in Fall Creek did. The

analysis, however, is not so simple. In Fall Creek, the taxpayer had a fractional ownership

in the aircraft, so the second component of use—ownership or control—was satisfied. The

issue became whether the taxpayer had exercised any right or power incident to that

ownership. This Court said operational control during part 91 flights was a right or power

over the aircraft. In contrast, Aero is not an owner of the Excel as all parties agree APLUX

retained title and ownership rights. For that reason, to satisfy the second component of

“use,” Aero must have had control of the Excel under the lease agreement.

 The relevant provisions of the APLUX-Aero lease provided:

 2.4 Title to and ownership of the Aircraft shall be and remain in
 the name of Owner at all times throughout the Term and Operator will have
 no right, title or interest in or to the Aircraft, except the right to possession
 and use [of] the Aircraft during the Term in accordance with and subject to
 the terms and conditions of this Agreement.
 ....
 3.2 Owner shall deliver the Aircraft to Operator at the Spirit of
 St. Louis Airport, Chesterfield, Missouri (the “Base of Operation”).
 ....
 4.2 Scheduling of Charter Flights. Operator shall arrange,
 schedule and dispatch all Charter Flights. Operator may use and operate the
 Aircraft for a Charter Flight at any time during the Term without the prior
 consent or approval of Owner, provided Owner has not previously scheduled

 18
 the Aircraft for the same time interval. Owner retains scheduling priority for
 Owner Flights throughout the Term, provided an Owner Flight does not
 interfere with a previously scheduled Charter Flight.
 ....
 5.5 Cleaning and Provisioning. At the completion of each Charter
 Flight, Operator shall clean and provision the Aircraft at Operator’s expense.
 ....
 5.7 No Minimum Required. Nothing in this Agreement will be
 construed to constitute any guarantee that Operator will use the Aircraft for
 any minimum number of Flight Hours. Accordingly, Operator is only
 responsible for the Charter Fee for actual Flight Hours.
 ....
 6.3 Operational Control. Operator shall have operational control
 and possession, command and control of the Aircraft at all times during a
 Charter Flight.
 ....
 6.7 The Aircraft will be stored in a hangar at the Base of Operation
 [the Spirit of St. Louis Airport].
 ....
 7.5 Exclusivity. The Aircraft will be maintained by Operator
 without interruption and remain in Operator’s legal and actual possession
 directly or through its employees or agents. Operator will not use the Aircraft
 unless the Aircraft is under the legal and actual custody and possession of
 Operator and remains in Operator’s exclusive possession and custody during
 all Charter Flights. Owner may operate the Aircraft under FAR Part 91 under
 the operational control of Owner as long as the maintenance of the Aircraft
 is current under Operator’s FAA approved maintenance program. … 23

23
 The Aero-APLUX agreement also provided:
 2.3 Each operation of the Aircraft by Owner (APLUX) or a lessee
 of the Aircraft, other than Operator (Aero), including all maintenance flights,
 training flights, ferry or positioning flights to accommodate Owner or
 Owner’s lessee’s operation of the Aircraft, or other similar flights during
 which the Aircraft is not being operated by Operator as a Charter Flight
 (each, an “Owner Flight”) shall be conducted in accordance with FAR Part
 91 and as such may not involve the provision of air transportation for any
 kind of compensation or reimbursement, except as might be permitted by
 FAR Part 91.501. Nothing contained in this Agreement is intended or should
 be constructed to grant Owner or Owner’s lessee (a) any authority to conduct
 flight operations under FAR Part 135 or (b) any control over a Charter Flight.
 ....
 11.1 Licenses. Operator represents, warrants and agrees that during
 the Term, Operator shall (a) continue to hold and keep current the valid
 19
 These provisions gave APLUX the right to schedule “owner flights” for itself if

Aero had not already scheduled a charter flight, and Aero had the right to use the Excel for

charter flights at any time, provided APLUX had not already scheduled the Excel for an

owner flight. This is not the same as the APLUX-Luxco agreement, under which APLUX

is the one who had a right to use the aircraft at any time and only when APLUX was not

using the aircraft would Luxco get to schedule a flight on a “first come, first served” basis.

Further, the Aero agreement provided Aero with significantly more than just operational

control during flights. The agreement required APLUX to deliver the Excel to Aero’s base

of operations, the Spirit of St. Louis Airport, where the Excel would continue to be

hangered for the duration of the agreement’s term. It also expressly provided, “The Aircraft

will be maintained by Operator [Aero] without interruption and remain in Operator’s legal

and actual possession directly or through its employees or agents.” Further, Aero was

responsible for finding pilots and crew for its charter flights as well as for cleaning and

maintaining the Excel after each charter flight and throughout the lease term. Aero also

could repair the Excel if it was damaged, and even though the repairs were at APLUX’s

expense, the lease provided the Excel “shall be considered as being under Operator’s

[Aero’s] care, custody, and control” while such maintenance work was being performed.

Aero also provided insurance for the Excel at APLUX’s expense.

 Operating Certificate, (b) maintain current Department of Transportation
 (“DOT”) registration and (c) comply with the requirements of the Operating
 Certificate, DOT registration and all applicable FARs and other laws.
 20
 These provisions are substantially similar to the lease provisions this Court

discussed in Business Aviation. There, this Court focused on the fact that the lessee: 1) had

operational control of the aircraft during charter flights; 2) provided hangar space for the

aircraft for the duration of the lease term; 3) was responsible for all maintenance of the

aircraft, during which maintenance the aircraft was under the exclusive care, custody, and

control of the lessee; and 4) provided pilots, maintained records, and provided supplies

necessary for the aircraft to operate in accordance with FAA regulations. Bus. Aviation,

579 S.W.3d at 217-18.

 Indeed, the only discernable difference between the agreement in Business Aviation

and the Aero agreement is that the Excel was the subject of an agreement with two

companies, whereas the aircraft in Business Aviation was leased to one company

exclusively. The AHC declined to find that fact to be of great legal weight in determining

whether use had been transferred to Aero. On appeal, neither party points this Court to

authority that personal property cannot be exempt when it is the subject of more than one

lease. Indeed, the issue is not how many non-exclusive leases a purchaser such as APLUX

signs with third parties but rather which party retains control and exercises “any right or

power” incident to that control. 24

24
 For example, depending on its provisions, a timeshare agreement may involve true leases
to multiple persons. The question for use tax purposes is whether APLUX retained control,
not whether it gave what it nominally called “leases” but that did not grant exclusive use
or priority rights to one or more others. By contrast:

 Timeshare interests most often exist in one of three forms: (1) fee simple
 ownership interests in underlying real estate--the most common ownership
 form in the U. S.; (2) lease arrangements that permit ownership rights for a
 21
 Given this Court’s holding in Business Aviation—on substantially similar facts as

those presented here—that control of the aircraft had been transferred to the lessee, the

AHC did not err in ultimately concluding Aero had control of the Excel under the lease.

Because Aero also had a right or power incident to that control, the AHC did not err in

concluding APLUX transferred use of the Excel to Aero. It also did not err, therefore, in

finding APLUX had demonstrated it was entitled to a use tax exemption on the out-of-state

purchase of the Excel under the interplay among sections 144.018.1(4), 144.615(3), and

144.030.2(20).

 Section 144.018.1(4) provides that a purchase for resale (here, the purchase of the

Excel) is exempt from tax under chapter 144 if the subsequent sale (here, the lease to Aero)

is “[s]ubject to tax but exempt under this chapter.” The lease of the Excel to Aero is subject

to tax under section 144.020(8) (sales tax) or section 144.610.1 (use tax), both of which

impose “[a] tax equivalent to four percent of the amount paid or charged for rental or lease

of tangible personal property.” The lease to Aero is exempt from tax, however, because

 specified period (“right to use”); or (3) “point” system, whereby purchasers
 buy points rather than an interest in an underlying condominium or timeshare
 unit (e.g., Disney Vacation Club). The first type of timeshare interest
 includes a deed to the property that captures all attendant rights to deeded
 ownership (e.g., title and title insurance protection, right to rent, assign, sell,
 contribute, bequeath, or otherwise transfer interest to a third party). In
 contrast, under a lease timeshare arrangement, ownership rights may exist,
 but only for a stipulated period, after which the developer secures title to the
 property. Point systems are frequently structured as right-to-use lease
 arrangements with a definitive expiration date.

Caroline K. Craig & Suzanne M. Luttman, Taxation of Timeshares - Acquisition, Use, and
Disposition Issues, 27 J. Real Est. Tax’n 301, 302 (2000) (footnote omitted).
 22
section 144.615(3) exempts from use tax any property, the sale or other transfer of which

would be exempt from sales tax under section 144.030.2, and section 144.030.2(20)

exempts “[a]ll sales of aircraft to common carriers for storage or for use in interstate

commerce.” § 144.030.2(20).

 No one disputes Aero is a common carrier. As in Business Aviation, therefore, the

purchase price of the Excel is exempt under the interplay among sections 144.018.1(4),

144.615(3), and 144.030.2(20). 25

VI. CONCLUSION

 APLUX did not transfer use of the TBM or Excel to Luxco; therefore, a “sale” by

lease to Luxco did not occur. APLUX did, however, transfer use of the Excel to Aero;

therefore, a “sale” by lease to Aero occurred with respect to the Excel. For that reason,

APLUX is entitled to a resale exemption for the Excel but not the TBM.

 The AHC’s decision is affirmed in part and reversed in part, and the case is

remanded.

 _________________________________
 LAURA DENVIR STITH, JUDGE

All concur.

25
 The director did not assess tax on the lease payments from Aero for the Excel,
acknowledging the lease payments are tax-exempt under section 144.030.2(20), which, as
quoted above, provides a tax exemption for “[a]ll sales of aircraft to common carriers for
storage or for use in interstate commerce.” § 144.030.2(20). Instead, the director argued
APLUX should have paid use tax on the initial sale of the Excel, an argument this Court
rejects based on the resale by lease to Aero.
 23